[Cite as *Crocker Park, L.L.C. v. Westlake*, 2026-Ohio-2932.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| CROCKER PARK, LLC, ET AL., | : | |
| Plaintiffs-Appellees, | : | |
| | | No. 115356 |
| v. | : | |
| CITY OF WESTLAKE, OHIO, | : | |
| Defendant-Appellant. | : | |

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED IN PART, REVERSED IN PART,
AND REMANDED
**RELEASED AND JOURNALIZED:** July 30, 2026

Civil Appeal from the Cuyahoga County Court of Common Pleas
Case No. CV-24-106203

***Appearances:***

Benesch, Friedlander, Coplan & Aronoff, LLP, Gregory J.
Phillips, and Alayna K. Bridgett, *for appellees*.

Michael P. Maloney, Westlake Director of Law, and Robin
R. Leasure, Westlake Assistant Director of Law; Seeley,
Savidge, Ebert & Gourash Co., LPA and Christopher M.
Corrigan, *for appellant*.

EILEEN T. GALLAGHER, P.J.:

{¶ 1} Defendant-appellant City of Westlake, Ohio ("Westlake" or "the City")

appeals two orders granting partial motions for summary judgment against

Westlake and in favor of plaintiffs-appellees Crocker Park, L.L.C. ("CP"), CP Phase I Residential Delaware, L.L.C., Crocker Excelsior, L.L.C., CP Commercial Delaware, L.L.C. ("CP Commercial"), and CP Land, L.L.C. (collectively "plaintiffs") and third-party-defendant-appellee Crocker Park Management, L.L.C. ("CP Management"). Westlake claims the following errors:

> 1. The Court of Common Pleas abused its discretion in ordering the plaintiffs to file summary judgment when pleadings had not been finalized and discovery had not been conducted on the issues[.]
>
> 2. The court erred [in] granting summary judgment when the parties had not conducted discovery on the facts of the dispute and all information was not before the court[.]
>
> 3. The court erred in granting plaintiffs' summary judgment on defendant's counterclaim for slander of title[.]
>
> 4. The court erred [in] granting plaintiffs summary judgment on defendant's . . . abuse of process claim[.]
>
> 5. The court erred [in] declaring that plaintiffs have not waived their ability/right to assert its right of first refusal on future offers[.]

{¶ 2} We find that the trial court did not err in granting the parties leave to file motions for summary judgment by March 17, 2025, because the pleadings had closed by that time, and Westlake could have sought leave for additional discovery pursuant to Civ.R. 56(F), if additional discovery were needed. We further find that the trial court properly granted summary judgment in favor of plaintiffs and the third-party defendant on Westlake's slander-of-title and abuse-of-process claims. However, because we find that CP failed to properly exercise its right of first refusal within a reasonable time, we find that the trial court erred in declaring that CP did

not waive its right of first refusal.  We, therefore, affirm the trial court's judgment in part, reverse it in part, and remand the case to the trial court for further proceedings.

## I. Facts and Procedural History

{¶ 3} Plaintiffs filed a complaint and a verified amended complaint against Westlake, alleging the breach of multiple contracts and seeking various forms of declaratory and injunctive relief as well as money damages.[1]  The allegations arose from the parties' relationship to a mixed-use development located on Crocker Road in Westlake, Ohio, known as "Crocker Park."

{¶ 4} Crocker Park was developed on multiple contiguous parcels of property and contains a mix of retail stores, restaurants, office buildings, apartments, and green spaces.  The Crocker Park planners intended the different parcels of property that compose Crocker Park "to interrelate and function to their mutual advantage and benefit such that the eventual owners of the parcels, and their permittees, would have access to certain 'common areas' throughout the development."  (Verified amended complaint ¶ 12.)  Thus, CP drafted a "Declaration of Covenants, Conditions, Restrictions and Easements" (the "Declaration") governing the use and ownership of the various parcels that compose Crocker Park.[2]  The Declaration

---

[1] The allegations in, and the exhibits attached to, the amended complaint were verified under oath by Steve Coven, the secretary of CP and general counsel of Stark Enterprises, Inc., CP's agent, exclusive property manager, and leasing agent.

[2] The Declaration was verified and submitted with the verified amended complaint as Exhibit A.  Coven also verified the authenticity of the Declaration in an affidavit submitted with plaintiffs and third-party defendant's motion for partial summary judgment.

identifies CP as the declarant and defines the term "Owner" or "Owners" to mean "the current and future owners of the parcels comprising Crocker Park." (Verified amended complaint, Exhibit A.)

{¶ 5} One of the disputes between plaintiffs and Westlake involved the cost of maintaining and repairing "Common Areas." Section 1.9 of the Declaration defines the term "Common Area," in part, as "all portion of the Project Site available for the general use, convenience and benefit of all Owners and their respective Permittees," subject to some exceptions not relevant to this case.

{¶ 6} Section 1.10 of the Declaration defines the term "Common Expenses" as follows:

> The term "Common Expenses" means (i) the cost and expense of operating, maintaining, repairing and replacing the Common Area and/or the Public Improvements, including, but not limited to, all costs and expenses incurred by [CP Management] under the Management Agreement; (ii) the cost of utilities serving the Common Areas and/or the Public Improvements, (iii) the cost of garbage and trash removal for the Project, except special charges that can be specifically identified as belonging to one Parcel, (iv) the cost, expense, and premium for all insurance attributed to Common Areas; (v) Real Estate Taxes for the Common Areas and/or the Public Improvements (if any), and (vi) any other cost, expense, fee or charge deemed a Common Expense under this Declaration.

{¶ 7} Regarding maintenance and repair of Common Areas, Section 6.2 of the Declaration provides:

> Subject to the payment provisions in Section 6.4 hereof and the easements, terms, covenants, conditions, restrictions and rights granted, declared and/or reserved hereunder, the Common Areas shall at all times be maintained and managed by Declarant except that each Owner is required to provide security for the Common Areas located within its respective Parcel and Declarant shall have the obligation and

responsibility to keep, maintain, manage and operate the Common Areas in good, clean operating condition, order and repair consistent with the operation of similar first-class mixed-use developments located in the State of Ohio and shall keep the Common Areas clean and (as applicable) reasonably clear of snow and ice. Notwithstanding the foregoing, Declarant agrees that the Public Improvements, if constructed, may be maintained and managed by [CP Management] in accordance with standards established under applicable Port Authority Agreements. Declarant shall (and [CP Management], as to the Public Improvements, may) manage, calculate and coordinate among the Owners the payment of Common Expenses.

{¶ 8} Section 6.4 of the Declaration governs payment of Common Expenses and states, in relevant part: "Each Owner shall pay to Declarant (or [CP Management] as to the Public Improvements), pursuant to the provisions of this Section 6.4, its share of the Common Expenses, calculated based on the Budget and such Owner's Proportionate Share." Section 1.50 defines the term "Proportionate Share" as "the percentage assigned by Declarant from time to time with respect to each Parcel/Owner." (Declaration p. 8.) Section 6.4(b) requires that "[e]ach Owner's share of the Common Expenses shall be paid in equal monthly installments in such amounts as are reasonably estimated and billed by Declarant." The Declaration was recorded with the Cuyahoga County Recorder on December 8, 2003. (Verified amended complaint ¶ 29.)

{¶ 9} In March 2014, CP and Westlake executed the "Market Square Development Agreement" (the "Development Agreement") whereby CP agreed to "convey to the City, at no cost to the City, approximately two (2) acres of land within

[Crocker Park]."[3] (Verified amended complaint ¶ 32; development agreement p. 1.) In exchange for the free land, Westlake "agreed to construct on the Parcels, at the City's cost, a market square with improvements to be designed and adjacent open space." (Verified amended complaint ¶ 33; development agreement p. 1.) The land conveyed to Westlake, together with its improvements, is known as "Market Square." (Verified amended complaint ¶ 35.) Westlake accepted deeds to the land subject to "any reservations, restrictions, limitations, easements, and conditions of title[,]" including the conditions of title outlined in the Declaration. (Verified amended complaint ¶ 37-38.) Hence, Westlake became an owner of Crocker Park subject to the covenants, conditions, and restrictions set forth in the Declaration.

{¶ 10} Market Square was constructed and became operational in 2015. (Verified amended complaint ¶ 47.) It is comprised of an indoor event space, a half-acre outdoor green space, and two restrooms with entrances on the exterior of the building. The restrooms have been open to all "Permittees" since they were constructed.[4] (Verified amended complaint ¶ 49.) Plaintiffs allege that "Market Square's greenspace and restrooms constitute Common Areas as defined in the Declaration." (Verified amended complaint ¶ 50.) They also allege that "Market Square's common restrooms must remain open and accessible to other Owners and

---

[3] The Development Agreement is attached to the verified amended complaint as Exhibit B.

[4] Section 1.42 of the Declaration defines the term "Permittees" to include "all occupants, including tenants, of the Parcels and their and each Owner's respective officers, directors, employees, agents, partners, contractors, customers, visitors, invitees, licensees and concessionaries."

their Permittees in order for Crocker Park to comply with local zoning and building codes." (Verified amended complaint ¶ 51.)

{¶ 11} In September 2015, Westlake entered into an Operation and Maintenance Agreement ("O&M Agreement") with CP Management, a wholly owned subsidiary of CP.[5] Under the O&M Agreement, CP Management agreed to operate and manage Market Square. Section 3(b) of the O&M Agreement provides, among other things, that CP Management will perform "all maintenance and repairs to [Market Square]." The O&M Agreement further states that "[i]n the event that revenues in any year are insufficient to pay in full all out-of-pocket expenses from the operation of [Market Square], [CP Management] will be obligated to pay the unpaid portion of such out-of-pocket expenses." (Verified amended complaint ¶ 57; O&M Agreement, Section 3(c).)

{¶ 12} CP Management operated Market Square for eight years until Westlake terminated the agreement in December 2023. Plaintiffs allege there were insufficient revenues to pay for out-of-pocket expenses related to the operation of Market Square, including its proportionate share of the Common Expenses, during the eight years that CP Management managed Market Square. (Verified amended complaint ¶ 60-61.) As a result, CP Management paid the out-of-pocket expenses, including Common Expenses, for the eight years it managed Market Square.

---

[5] The O&M Agreement is attached to the original complaint as Exhibit D.

{¶ 13} Plaintiffs allege that after the O&M Agreement terminated on December 31, 2023, CP Management was no longer responsible for paying Westlake's proportionate share of Common Expenses as required under the Declaration. (Verified amended complaint ¶ 63-64.) In March 2024, CP sent a letter to Westlake advising it of its obligation to pay Common Expenses as required by the Declaration. (Plaintiffs and third-party defendant's partial motion for summary judgment filed on March 17, 2025, Exhibit B-9.) Along with the letter, CP enclosed a proposed 2024 budget for the Common Expenses. On April 5, 2024, the City replied with a letter stating, in relevant part:

> The City of Westlake disputes your client's claim that the City owes a common area maintenance fee as a result of terminating the Market Square Management Agreement. . . . [T]he City disagrees that it is obligated to pay these maintenance fees, and therefore declines to pay the same.

(Verified amended complaint ¶ 70; plaintiffs and third-party defendant's motion for summary judgment filed on March 17, 2025, Exhibit B-10.)

{¶ 14} Thereafter, on April 30, 2024, Steven Coven ("Coven") sent a letter to Westlake advising it that it was in default of the Declaration for failing to pay its proportionate share of the Common Expenses for Market Square from January through March 2024.[6] (Verified amended complaint ¶ 74; R. 52, Exhibit B-12.) CP Commercial claimed the City owed $22,367.37 in Common Expenses for the first three months of 2024. In a letter from Westlake's mayor dated May 7, 2024, the

---

[6] As previously stated, Coven is general counsel of Stark Enterprises, Inc., CP's agent and exclusive property manager and leasing agent.

City again repudiated the claimed expenses. (Plaintiffs and third-party defendant's motion for summary judgment filed on March 17, 2025, Exhibit B-13.) As a result, plaintiffs placed a lien on Market Square, for the outstanding Common Expenses in the amount of $22,367.37.

{¶ 15} On October 8, 2024, CP sent the City another default notice regarding its outstanding proportionate share of Common Expenses for Market Square from April through September 2024, totaling $36,974.41. (Verified amended complaint ¶ 75; plaintiffs and third-party defendant's motion for summary judgment filed on March 17, 2025, Exhibit B-15.) In November 2024, Westlake sent CP letters and checks totaling $70,525.45, for "the common expenses allegedly owed by the City of Westlake." (Verified amended complaint ¶ 76; plaintiffs and third-party defendant's motion for summary judgment filed on March 17, 2025, Exhibit B-16-17.) Plaintiffs allege that Westlake paid the outstanding Common Expenses in order to release the lien because it wanted to sell the property. (Verified amended complaint ¶ 78.)

{¶ 16} On October 1, 2024, the mayor of Westlake sent CP a letter notifying it that the City had received an offer from E&C Sports Group, L.L.C. (the "buyer" or "E&C") to purchase Market Square. (Verified amended complaint ¶ 80, Exhibit L.) The letter acknowledged that under the parties' Development Agreement, CP retained a right of first refusal. The letter further stated, in relevant part:

> Please notify me, in writing, by October 15, 2024, if Crocker Park, L.L.C. is exercising its right to acquire the Markert Square Property . . . . Failure to exercise the right of first refusal at this time will be deemed a waiver of said right in the future.

(Verified amended complaint, Exhibit L.) Plaintiffs allege that the City's letter unilaterally imposed a temporal restriction on CP's right of first refusal because the Development Agreement did not contain such a restriction. (Verified amended complaint ¶ 84.) They also allege that the letter "incorrectly stated that CP's right of first refusal requires it to obtain Market Square under 'the same terms and conditions' as those set out in the proposed agreement between the City and its third-party buyer." (Verified amended complaint ¶ 85.) Plaintiffs allege that Section 9 of the Development Agreement only requires that CP agree to "the same price offered by such third party" and that no other conditions related to the third party are binding on CP. (Verified amended complaint ¶ 85.)

{¶ 17} Plaintiffs allege that the City did not inform the buyer of its obligations under the Declaration to pay its proportionate share of the Common Expenses as the owner of Market Square before E&C made its original offer. They allege that the City only informed the buyer of this approximately $70,000 per year obligation after the City informed CP of the proposed sale. Nevertheless, CP communicated to the City that it intended to exercise its right of first refusal to purchase Market Square. The City acknowledged receipt of the communication in a letter dated November 5, 2024. The November 5, 2024 letter instructed CP to "deliver a formal and detailed written offer to [the Mayor] and the City of Westlake within seven (7) days of this letter." (Verified amended complaint ¶ 105, Exhibit O.) Plaintiffs allege this seven-day deadline was manufactured by Westlake and was not required under the terms of the Development Agreement. (Verified amended complaint ¶ 105.)

**{¶ 18}** Plaintiffs responded in a letter dated November 7, 2024, stating that

> [w]hile CP disagrees with the City's characterization of the parameters of CP's right of first refusal, and further denies that any third-party offer to date has activated CP's right of first refusal, CP intends to make an offer on the Market Square property. CP would like to discuss this offer with the City at the City's earliest convenience.

(Verified amended complaint ¶ 108, Exhibit P.)

**{¶ 19}** CP asked to discuss the purchase of Market Square with the City's mayor and council president. Plaintiffs allege the City's counsel refused to allow direct talks with the mayor and council president and represented to them that any requested meeting would be with the City's counsel over the phone. (Verified amended complaint ¶ 110-112.) CP also asked that Westlake remove the deadline for exercising its right of first refusal and now claims the City refused.

**{¶ 20}** On November 21, 2024, CP sent a letter to Westlake offering to purchase the Market Square property for $2,600,000, the same price offered by E&C, subject to certain conditions, including that (1) the property would be exempt from property tax, and (2) "the Purchase Price will be eligible for reimbursement from the Crocker Park Phase 3 waterfall." (Verified amended complaint, Exhibit Q.) According to the amended counterclaim, CP knew the conditions set forth in the November 21, 2024 letter are not contemplated by Section 9 of the Development Agreement and that they are not legally permissible since R.C. 5709.40 does not allow tax increment financing and payments in lieu of taxes. (Verified amended complaint ¶ 114, Exhibit Q.)

**{¶ 21}** The City rejected the offer in a letter dated November 21, 2024, stating that CP's offer was untimely and it did not match the material terms of the buyer's offer. (Verified amended complaint ¶ 115, Exhibit R.) CP responded in a letter that same day, stating that "[t]he City's rejection of [CP]'s exercise of its ROFR is legally erroneous and ignores the plain language of the Development Agreement." (Verified amended complaint ¶ 117, Exhibit S.)

**{¶ 22}** On November 7, 2024, the City began the process of submitting its agreement with E&C to the city council for approval. (Verified amended complaint ¶ 111.) Plaintiffs assert that the City's failure to accept CP's exercise of its right of first refusal to purchase Market Square constitutes a breach of contract.

**{¶ 23}** In their prayer for relief, plaintiffs requested declaratory judgments declaring that (1) the Market Square property is subject to the terms and conditions of the Declaration, (2) the City is an "Owner" obligated to pay Common Expenses under Section 6.4(a) of the Declaration, (3) Market Square contains Common Areas as defined by the Declaration, including the common restrooms and green space, (4) the Development Agreement does not set a temporal restriction on CP's ability to exercise its right of first refusal, and (5) under the Development Agreement, CP is only obligated to match the purchase price proposed by a third-party buyer to exercise its right of first refusal and nothing else.

**{¶ 24}** Plaintiffs further requested a preliminary and permanent injunction enjoining the City from selling Market Square until the issues raised in their verified

amended complaint are resolved.[7]  Plaintiffs also sought monetary damages in excess of $25,000.

**{¶ 25}** Westlake answered plaintiffs' verified amended complaint and asserted counterclaims for abuse of process, slander of title, quiet title, and for declaratory relief.  The City alleged in the third-party complaint that, under the direction of CP, CP Management did not pay revenues to the City and refused to provide financial records for the operations of Market Square to the City.  (Amended counterclaim ¶ 7-8.)  It also alleged that the mayor informed CP that it intended to sell Market Square in December 2023.  (Amended counterclaim ¶ 9.)

**{¶ 26}** It is undisputed that in June 2024, CP Commercial filed a lien on the Market Square property to cover Common Expenses, in the amount of $ 22,367.37.  Westlake alleged that the City paid all outstanding Common Expenses in November 2024, that CP Commercial deposited the funds from Westlake without objection, but it nevertheless refused to withdraw the lien on the property.  (Amended counterclaim ¶ 13-17.)  The City contends that representatives of CP Commercial

---

[7] On January 24, 2025, while the lawsuit was pending, CP and E&C executed the "Market Square Right of First Refusal Agreement and Mutual Release" (the "E&C Market Square Agreement") wherein CP agreed to forbear exercising its right of first refusal as set out in the Development Agreement and allow the City to proceed with the sale of Market Square to E&C.  (Verified amended complaint ¶ 37.)  On that same day, plaintiffs withdrew their claims for injunctive relief.  In executing the E&C Market Square Agreement, E&C expressly acknowledged and agreed that the Market Square property is subject to the terms and conditions of the Declaration, including the obligation requiring each owner to pay its proportionate share of the common expenses incurred for the maintenance of common areas.

made the removal of the lien part of the negotiations to force Westlake to accept CP's terms and conditions even though the lien was paid. (Amended counterclaim ¶ 18.)

{¶ 27} The City acknowledged in the amended counterclaim that the mayor sent a letter to CP on October 1, 2024, requesting that CP inform Westlake "in writing" by October 15, 2024, if it was going to exercise its right of first refusal. (Amended counterclaim ¶ 25.) The mayor subsequently extended the deadline to October 31, 2024. (Amended counterclaim ¶ 25-26.)

{¶ 28} Regarding any temporal restrictions on CP's right of first refusal, Westlake quoted language from Section 11(f) of the Development Agreement, which states that "[t]ime is of the essence with respect to all time periods and dates for the performance of the City's and [CP]'s respective obligations under this Agreement." (Amended counterclaim ¶ 23.) The City alleges that it was waiting for a response as to whether CP was going to exercise its right of first refusal when plaintiffs filed their initial complaint on October 28, 2024.

{¶ 29} When CP did not submit an offer to purchase the Market Square property by the October 31, 2024 deadline, Westlake, through counsel, sent a letter to Coven, dated November 5, 2024, asking that CP either make a written offer by end of business November 12, 2024, or inform it that it was not going to exercise its right of first refusal. (Amended counterclaim ¶ 31, Amended verified complaint, Exhibit O.) The November 5, 2024 letter advised CP that if Westlake did not receive a matching offer from CP by the end of business November 12, 2024, the City would proceed with the sale to E&C. (Amended counterclaim ¶ 32.) The November 5, 2024

letter states, in part, that "[t]ime is of the essence in this matter because E&C Sports, L.L.C., has made an acceptable offer and would like to proceed with the purchase, as would the City of Westlake." (Verified amended complaint, Exhibit O.)

{¶ 30} Westlake alleges that because CP did not submit an offer to purchase the Market Square property by the deadline, and it did not request additional time beyond the deadline, the City placed the purchase agreement with the buyer on the city council's agenda to begin the approval process. (Amended counterclaim ¶ 40-41.)

{¶ 31} On January 30, 2025, Westlake filed a third-party complaint against CP Management, alleging that CP Management breached its obligation under the M&O Agreement by failing to timely provide monthly operating statements and year-end financial statements to Westlake. (Third-party complaint ¶ 12-14.)

{¶ 32} Based on the allegations set forth in the amended counterclaim, Westlake asserted an abuse-of-process claim against CP, alleging that CP improperly initiated this lawsuit in order to interfere with Westlake's pending contract with E&C while CP was not willing to match C&E's offer. In the second count, Westlake sought a declaratory judgment declaring that CP's offer was not a legitimate offer under the Development Agreement because the Agreement does not contemplate CP's request to make the property exempt from property taxes. It also sought a declaration that CP's request for a tax exemption violates R.C. 5709.40.

{¶ 33} In the third count, Westlake asserted a claim for slander of title against CP Commercial, alleging that CP Commercial illegally maintained a lien on

the property after the debt, which was the subject of the lien, had been paid. Westlake also asserted an abuse-of-process claim against CP Commercial, alleging that it illegally maintained the lien on the property in order to compel Westlake to sell the property to CP on CP's terms. And, Westlake asserted a claim for quiet title to remove the lien on the property pursuant to R.C. 5303.01.

{¶ 34} On January 29, 2025, the trial court granted the parties leave to file cross-motions for summary judgment by March 17, 2025. The parties each filed motions for summary judgment, and plaintiffs, over objection, filed a supplemental motion for summary judgment. On June 22, 2025, the trial court granted plaintiffs' motions for partial summary judgment and denied Westlake's motion for partial summary judgment. The trial court found that the Declaration applied to Westlake and that it was required to pay its proportionate share of Common Expenses. It also found that green space and the exterior restrooms on the Market Square property are Common Areas as defined in the Declaration.

{¶ 35} On July 13, 2025, the trial court granted plaintiffs' supplemental motion for summary judgment as to Westlake's claim for declaratory judgment. The trial court declared that CP did not waive its right of first refusal on any offers to purchase the Market Square property. In its order, the court declared there was no just cause for delay. This appeal followed.

## II. Law and Analysis

## A. Pleadings and Discovery

{¶ 36} In the first assignment of error, Westlake argues the trial court erred in granting summary judgment in favor of plaintiffs before the close of the pleadings and without allowing the parties to conduct discovery.  In the second assignment of error, Westlake argues the trial court erred in granting summary judgment in favor of plaintiffs before the parties had an opportunity to conduct discovery.  We discuss these assigned errors together because they are interrelated.

{¶ 37} On January 29, 2025, the trial court issued a journal entry granting the parties leave until March 17, 2025, to file motions for summary judgment.  One day later, on January 30, 2025, Westlake filed its amended answer and counterclaims as well as its third-party complaint against CP Management.  Thus, the court granted the parties leave to file motions for summary judgment prior to the close of the pleadings.  However, the record shows that the parties actually filed their motions for summary judgment after the pleadings closed.

{¶ 38} Civ.R. 56 governs summary judgment and states, in relevant part, that "[a] party may move for summary judgment at any time after the expiration of the time permitted under these rules for a responsive motion or pleading by the adverse party, or after service of a motion for summary judgment by the adverse party." Civ.R. 56(A).  Nothing in the rule prevents the trial court from granting parties leave to file summary-judgment motions before the close of pleadings as long as the

motions are filed after "the expiration of the time permitted under these rules for a responsive motion or pleading by the adverse party[.]" Civ.R. 56(A).

{¶ 39} As previously stated, Westlake filed its amended answer, amended counterclaims, and third-party complaint on January 30, 2025. Plaintiffs filed their response to Westlake's amended counterclaims on February 13, 2025, and CP Management filed its answer to the third-party complaint on February 27, 2025. At that point, the pleadings were closed. The parties filed their respective motions for summary judgment on March 17, 2025, more than two weeks after the pleadings closed. Therefore, the motions for summary judgment were filed in accordance with the requirements of Civ.R. 56(A). Westlake has not cited any legal authority to support its assertion that the trial court erred in granting the parties leave to file summary-judgment motions prior to the close of pleadings when the motions were filed after the pleadings were closed, nor have we found any. We, therefore, find no error in the trial court's January 29, 2025 judgment entry, granting the parties leave to file motions for summary judgment by March 17, 2025.

{¶ 40} Westlake nevertheless contends that the trial court erred in ordering motions for summary judgment to be filed before the parties completed discovery. However, "the remedy for a party who must respond to a summary judgment motion before he or she has completed adequate discovery is a motion under Civ.R. 56(F)." *Reigles v. Urban*, 2010-Ohio-4427, ¶ 12 (11th Dist.). And, "'a party who fails to seek relief under Civ.R. 56(F) in the trial court does not preserve its rights thereto for purposes of appeal.'" *Maschari v. Tone*, 2004-Ohio-5342, ¶ 20, quoting *Taylor*

*v. Franklin Blvd. Nursing Home, Inc.*, 112 Ohio App.3d 27, 30 (8th Dist. 1996). Therefore, because Westlake failed to seek additional discovery as provided in Civ.R. 56(F), it forfeited this argument for purposes of appeal.

{¶ 41} Accordingly, the first and second assignments of error are overruled.

## B. Summary Judgment

{¶ 42} In the third and fourth assignments of error, Westlake argues the trial court erred in granting summary judgment in favor of plaintiffs on its counterclaims for slander of title and for abuse of process. In the fifth assignment of error, Westlake argues the trial court erred in granting summary judgment in favor of CP on its declaratory-judgment claim seeking a decree that Westlake has the right to transfer title of the property to E&C because CP waived its right of first refusal.

## 1. Standard of Review

{¶ 43} Appellate review of summary judgments is de novo. *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105 (1996). Pursuant to Civ.R. 56(C), summary judgment is appropriate when (1) there is no genuine issue of material fact; (2) the moving party is entitled to judgment as a matter of law; and (3) reasonable minds can come to but one conclusion and that conclusion is adverse to the nonmoving party, the party being entitled to have the evidence construed most strongly in his or her favor. *Horton v. Harwick Chem. Corp.*, 73 Ohio St.3d 679 (1995), paragraph three of the syllabus.

{¶ 44} The party moving for summary judgment bears the burden of showing that there is no genuine issue of material fact and that he or she is entitled to

judgment as a matter of law. *Dresher v. Burt*, 75 Ohio St.3d 280, 292-293 (1996). Once the moving party satisfies its burden, the nonmoving party "may not rest upon the mere allegations or denials of the party's pleadings, but the party's response, by affidavit or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Civ.R. 56(E); *Mootispaw v. Eckstein*, 76 Ohio St.3d 383, 385 (1996).

## 2. Slander of Title

{¶ 45} In the third assignment of error, Westlake argues the trial court erred in granting summary judgment in favor of CP Commercial on Westlake's slander-of-title claim.

{¶ 46} To prevail on a slander-of-title claim, a plaintiff must prove "'(1) there was a publication of a slanderous statement disparaging claimant's title; (2) the statement was false; (3) the statement was made with malice or made with reckless disregard of its falsity; and (4) the statement caused actual or special damages.'" *N. Royalton Ct. Condo. Owners' Assn. v. Stadul*, 2024-Ohio-1280, ¶ 27 (8th Dist.), quoting *Green v. Lemarr*, 139 Ohio App.3d 414, 430 (2d Dist. 2000).

{¶ 47} In support of plaintiffs and third-party defendant's motion for summary judgment, they submitted an affidavit from Coven in which he averred that although CP repeatedly reminded Westlake of its obligation under the Declaration to pay its proportionate share of Common Expenses, the City refused to pay its proportionate share of the Common Expenses. (Coven affidavit ¶ 11.)

**{¶ 48}** Section 19.11(a) of the Declaration governs liens and enforcement thereof and states, in part, that "[e]ach Owner's obligation to pay its Proportionate Share of the Common Expenses or any charge or payment provided in this Declaration shall, to the extent permitted by law, constitute a lien on each Owner's respective Parcel." Section 19.11(b) further states:

> If an Owner of a Parcel shall fail to pay its Proportionate Share of the Common Expenses or any other sum which becomes due under this Declaration within thirty (30) days following receipt of the bill therefore . . . the other Owners shall, to the extent now or hereafter permitted by law, have the right and power to enforce the lien imposed by Section 19.10(a).

**{¶ 49}** According to Coven, Westlake "repudiated its obligations under the Declaration" and expressly disputed plaintiffs' claim that Westlake was obligated to pay its proportionate share of Common Expenses incurred for maintenance of Common Areas. (Coven affidavit ¶ 12.) Coven further averred that on April 30, 2024, CP notified Westlake that it was in default of the Declaration for failing to pay its share of Common Expenses from January through March 2024, totaling $22,367.37. Thereafter, CP Commercial filed the lien on June 12, 2024, in an effort to collect the outstanding principal balance and interest as contemplated by Section 6.4(b) of the Declaration, which provides that each owner's share of Common Expenses "shall be paid in equal monthly installments in such amounts as are reasonably estimated and billed . . . at the beginning of each calendar year according to the Budget[.]" Section 6.4(b) further states, in relevant part:

> If any installment of Common Expenses remains unpaid after the tenth (10th) day of any calendar month, such Owner shall be deemed to be a

Defaulting Owner and shall incur interest at the per annum rate equal to two percent (2%) in excess of the announced "prime" or "base" rate of interest reported in the Money Returns column or comparable section of The Wall Street Journal as the rate then in effect for corporate loans at large U.S. money center commercial banks, whether or not such rate has actually been charged by any such bank (the "Default Interest Rate") from the date said installment was actually due until the date actually paid.

{¶ 50} It is undisputed that, in November 2024, Westlake paid the $22,367.37 that it owed for the first three months of Common Expenses. CP Commercial argues that Westlake continued to owe unpaid interest that accrued on the outstanding debt and that it, therefore, had a legitimate basis for maintaining the lien on the Market Square property after Westlake paid the $22,367.37. (Coven affidavit ¶ 19.) Therefore, CP Commercial argues, Westlake cannot demonstrate that the lien was false or slanderous.

{¶ 51} Westlake, however, argues that when CP Commercial cashed Westlake's check for $22,367.37, its acceptance of that payment constituted an accord and satisfaction of the City's entire debt. An accord is a contract between a debtor and a creditor in which the creditor's claim is settled in exchange for sum of money other than the amount that is allegedly due. *Allen v. R.G. Indus. Supply*, 66 Ohio St.3d 229, 231 (1993). "'If a party against whom a claim for damages is made can prove accord and satisfaction, that party's debt is discharged by operation of law.'" *Byars v. RLG Builder, Inc.*, 2010-Ohio-2869, ¶ 31 (5th Dist.), quoting *Allen* at 231.

When an accord and satisfaction is pled by the defendant as an affirmative defense, the court's analysis must be divided into three

distinct inquiries. First, the defendant must show that the parties went through a process of offer and acceptance — an accord. Second, the accord must have been carried out — a satisfaction. Third, if there was an accord and satisfaction, it must have been supported by consideration.

Two essential safeguards built into the doctrine of accord and satisfaction protect creditors or injured parties from overreaching debtors or tortfeasors: (1) there must be a good-faith dispute about the debt, and (2) the creditor must have reasonable notice that the check is intended to be in full satisfaction of the debt.

*Allen* at 231, paragraphs one and two of the syllabus. *See also M&T Elec. Co. v. LLLJ, Ltd.*, 2024-Ohio-5678, ¶ 19 (8th Dist.) ("[T]he claim is discharged if the defendant proves that the instrument or accompanying written communication contained a conspicuous statement to the effect that the instrument was tendered as full satisfaction of the claim.").

{¶ 52} On November 15, 2024, Westlake sent a letter with a check payable to CP Commercial in the amount of $22,367.37, the amount of unpaid Common Expenses. The letter that accompanied the check stated, in relevant part:

Enclosed is a $22,367.37 check payable to CP Commercial Delaware, LLC as **payment in full** of the common area expenses owed by the City of Westlake through April 2024.

**This payment is satisfaction of your lien** filed on June 12, 2024, against the Market Square Property[.]

(Emphasis added.)

{¶ 53} The parties dispute whether Westlake owed interest on the outstanding debt for Common Expenses. CP Commercial asserts that Westlake's November 15, 2024 letter did not constitute full satisfaction of Westlake's debt because it did not include the accrued interest. Westlake argues that its letter clearly

states that the enclosed payment constituted "payment in full of the common area expenses" and that the payment "is satisfaction of your lien." Taken together, these statements provide notice that the enclosed payment was intended to satisfy the full amount of Westlake's debt.

{¶ 54} However, there is no evidence that any consideration was provided in exchange for the alleged discharge of Westlake's debt. A preexisting duty to perform an obligation cannot serve as consideration for a contract. *Przylepa v. Przylepa*, 77 Ohio App.3d 808, 811 (3d Dist. 1991), citing *Shannon v. Universal Mtge. & Discount Co.*, 116 Ohio St. 609, 621 (1927).

> "An accord and satisfaction is the result of an agreement between the parties, and this agreement, like all others, must be consummated by a meeting of the minds of the parties. Mere cashing of the check d[oes] not bring the transaction within the rule of accord and satisfaction."

*Lightbody v. Rust*, 2003-Ohio-3937, ¶ 22 (8th Dist.), quoting *Warner Elevator Mfg. Co. v. Higbee*, 53 Ohio App. 546, 548 (1st Dist. 1935).

{¶ 55} At the very least, the parties disagree as to whether the debt was discharged, and there was no meeting of the minds. Therefore, the City cannot establish that CP Commercial maliciously or recklessly refused to remove the lien in order to interfere with sale of the property to the buyer. In the absence of any evidence of malice or recklessness on part of CP Commercial, the City cannot establish the third element of its slander-of-title claim.

{¶ 56} The third assignment of error is overruled.

### 3. Abuse of Process

{¶ 57} In the fourth assignment of error, Westlake argues the trial court erred in granting summary judgment in favor of plaintiffs on its two counterclaims for abuse of process. In the first claim, Westlake alleged that CP improperly initiated this lawsuit in order to interfere with Westlake's pending contract with E&C. In the second claim, Westlake alleged that CP Commercial refused to remove the lien on the Market Square property in order to compel Westlake to sell the property to CP on CP's terms.

{¶ 58} To prevail on an abuse-of-process claim, the claimant must establish that (1) a legal proceeding has been set in motion in proper form and with probable cause, (2) the proceeding has been perverted to accomplish an ulterior purpose for which it was not designed, and (3) damage resulted from the wrongful use of the process. *Yaklevich v. Kemp, Schaeffer & Rowe Co., L.P.A.*, 68 Ohio St.3d 294 (1994), paragraph one of the syllabus.

{¶ 59} "[T]he 'ulterior motive' component of an abuse-of-process claim 'occurs where someone attempts to achieve through use of the court that which the court is itself powerless to order.'" *Murphy v. Ditech Fin., L.L.C.*, 2018-Ohio-5041, ¶ 6 (8th Dist.), quoting *Robb v. Chagrin Lagoons Yacht Club, Inc.*, 75 Ohio St.3d 264, 271 (1996). "'[T]here is no liability [for abuse of process] where the defendant has done nothing more than carry out the process to its authorized conclusion, even though with bad intentions.'" *Yaklevich* at 298, quoting *Prosser and Keeton on the Law of Torts*, § 121, 898 (5th Ed. 1984).

{¶ 60} Regarding Westlake's first abuse-of-process claim, the City alleged that CP "filed suit, issued subpoenas, filed the motion for an injunction and took other delay tactics and made personal attacks on the purchasers in the pleadings for the primary purpose of dissuading [the buyer] and other potential purchasers from pursuing the purchasing of the Market Square Property." (Amended counterclaim ¶ 56.) It further alleged that CP filed suit "for the purpose of eliminating the pool of potential purchasers of the Market Square Property and drive down the purchase price of the Market Square Property." (Amended counterclaim ¶ 57.)

{¶ 61} According to the verified amended complaint, plaintiffs initiated this lawsuit to protect CP's right of first refusal and to collect the City's proportionate share of unpaid Common Expenses. In its merit brief on appeal, Westlake asserts that instead of responding to Westlake's offer of additional time to match the buyer's offer, it "filed suit against Westlake and issued subpoenas to the potential purchaser to harass it." (Appellant's brief p. 14.) However, Westlake does not cite any evidence in the record to establish that CP's actions drove away potential purchasers or drove down the purchase price. Under App.R. 16(A)(7), an appellant must include not only arguments presented for review, but the appellant must also support the arguments in its brief with "'citations to the authorities, statutes, and parts of the record on which appellant relies.'" *Victor v. Kaplan*, 2020-Ohio-3116, ¶ 101 (8th Dist.), quoting App.R. 16(A)(7).

{¶ 62} CP presented evidence demonstrating that CP subsequently agreed to forbear its right of first refusal and allow the City to execute its proposed sale of the

Market Square property to the buyer, E&C Sports Group, L.L.C. (Coven affidavit ¶ 38.) And, E&C subsequently purchased the Market Square property for the originally agreed upon price of $2.6 million (Phillips affidavit ¶ 2-3, plaintiffs and third-party defendant's motion for partial summary judgment, Exhibit E.). Therefore, the City failed to establish that it sustained damage as a result of CP's actions. It also failed to produce any evidence that plaintiffs filed the lawsuit for an ulterior purpose. Therefore, the trial court properly granted summary judgment in favor of plaintiffs on Westlake's first abuse-of-process claim.

{¶ 63} Regarding Westlake's second abuse-of-process claim, Westlake cites no legal authority to support its claim that filing a lien constitutes a "legal proceeding" that could be subject to an abuse-of-process claim. In any case, we have already determined that CP Commercial had a legitimate basis for maintaining its lien on the Market Square Property because the uncontroverted evidence established that Westlake owed outstanding interest on its debt for Common Expenses. The City has not produced any evidence that CP Commercial used the lien for any other purpose. Therefore, the trial court properly concluded that CP was entitled to summary judgment on the City's abuse-of-process claim.

{¶ 64} Accordingly, the fourth assignment of error is overruled.

### 4. Declaration Regarding CP's Right Of First Refusal

{¶ 65} In its fifth assignment of error, Westlake argues the trial court erred in finding that CP did not waive its right of first refusal because plaintiffs did not request such a declaration in the verified amended complaint.

{¶ 66} However, in its amended counterclaim, Westlake alleged that it "is entitled to an expedient declaration that Crocker Park has waived its rights under Section 9 and 11(f) of the Market Square Development Agreement." (Amended counterclaims ¶ 71.) In its prayer for relief, Westlake requested, among other things, a "decree that . . . Crocker Park, LLC, has waived its right to acquire Market Square." CP moved for summary judgment on Westlake's claim for declaratory judgment as part of its defense against the claim.

{¶ 67} Civ.R. 56(B) provides that a party against whom a declaratory judgment is sought may "move . . . for a summary judgment in the party's favor as to all or any part of the . . . declaratory judgment." Similarly, R.C. 2721.02(A), which governs the force and effect of declaratory judgments, states that "courts of record may declare rights, status, and other legal relations whether or not further relief is or could be claimed" and that "[t]he declaration may be either affirmative or negative in form and effect." Therefore, when a party moves for summary judgment on claim for declaratory judgment, the court ruling on the motion for summary judgment must declare the rights of the parties. *Shell Oil Co. v. Huttenbauer Land Co.*, 1993 Ohio App. LEXIS 1785, fn. 2 (1st Dist. Mar. 31, 1993.). Therefore, in ruling on plaintiffs' motion for summary judgment, the trial court was legally authorized to declare judgment in favor of CP even though it did not specifically request the declaration.

{¶ 68} Westlake nevertheless argues the trial court erred in finding that CP did not waive its right of first refusal to purchase the Market Square property. The

City argues that CP waived its right of first refusal by failing to accept the offer to purchase the property by its deadlines and because when it eventually made an offer, the offer was subject to certain conditions.

{¶ 69} On October 1, 2024, Westlake sent a letter to CP notifying it that the City received an offer from the buyer. The letter instructed CP to notify the City if it intended to exercise its right of first refusal under the same terms and conditions as the buyer by October 15, 2024. Thus, the City set a two-week deadline by which CP had to exercise its right of first refusal.

{¶ 70} Section 9 of the Development Agreement provides CP's right of first refusal, and it does not impose a two-week deadline. Therefore, Westlake unilaterally imposed the two-week deadline. However, Section 11(f) provides that "[t]ime is of the essence with respect to all time periods and dates for the performance of the City's and the Company's respective obligations under this Agreement."

> "When it is said that time is of the essence, the proper meaning of the phrase is that the performance by one party *at the time specified in the contract or within the period specified in the contract* is essential in order to enable him to require performance from the other party."

(Emphasis changed.) *Lake Ridge Academy v. Carney*, 66 Ohio St.3d 376, 378 (1993), quoting 6 R. Lord, *Williston on Contracts*, § 846, at 181 (3d Ed. 1962).

> "[W]hen a contract does not state the time for performance, then the law implies a reasonable time for performance, and a factfinder must determine whether the time spent performing is reasonable under the circumstances."

*Sai Hosp., Inc. v. RCVV, Inc.*, 2025-Ohio-4596, ¶ 35 (7th Dist.), quoting *Treadway Gallery, Inc. v. Baylor*, 2023-Ohio-3642, ¶ 11 (1st Dist.); *see also Garofoli v. Whiskey Island Partners Ltd.*, 2014-Ohio-5433, ¶ 35 (8th Dist.), quoting *Lewis v. DR Sawmill Sales, Inc.*, 2006-Ohio-1297, ¶ 18 (10th Dist.) (holding that "'[w]hen the performance period of a contract is undefined, the law implies a term assuming that the parties intended that performance take place within a reasonable time'").

{¶ 71} Although the Market Square Development Agreement states that "time is of the essence," the contract does not provide a specified time for performance. The question, therefore, is whether CP exercised its right of refusal within a reasonable time under the circumstances. *Id.* "The issue of '[w]hat constitutes a reasonable time for performance is an issue of fact to be determined by the conditions and circumstances under which the parties executed their agreement and contemplated performance.'" *Garofoli* at ¶ 35, quoting *Lewis* at ¶ 19. *See also Koon v. Hoskins*, 1996 Ohio App. LEXIS 346, *19 (4th Dist. Jan. 24, 1996), citing 18 Ohio Jur.3d, [Contracts] § 197 (1980) ("Whether the question of what is a reasonable time is a factual question or a legal question depends upon the nature of the transaction, but it is usually a question of fact for the jury."). Therefore, whether CP exercised its right of first refusal is a fact question not conducive to resolution by summary judgment.

{¶ 72} We nevertheless find that the City's second argument, regarding the additional conditions provided with CP's offer, is dispositive of this assigned error.

{¶ 73} A right of first refusal is generally defined as "a promise to present offers to buy property made by third parties to the promisee in order to afford the promisee an opportunity to match the offer." *Latina v. Woodpath Dev. Co.*, 57 Ohio St.3d 212, 212 (1991). A right of first refusal is a contract term subject to ordinary contract principles. *Halpern v. Smith*, 2023-Ohio-1370, ¶ 21-22 (8th Dist.). Ordinarily, a right of first refusal is a right to match all the terms and conditions offered by a third-party buyer, not merely the stated price. *W. Texas Transmission, L.P. v. Enron Corp.*, 907 F.2d 1554, 1565 (5th Cir. 1990).

{¶ 74} When the holder of a right of first refusal receives notice that the property owner intends to sell the property to a third party, "the rightholder's right of first refusal matures into an option for which the third-party offer generally dictates the terms." *W. Texas Transmission* at 1565. *See also* 77 Am.Jur.2d, Vendor and Purchaser, § 49 (1975).

{¶ 75} However, some courts have allowed purchasers to exercise their preemptive rights solely by matching the price term offered by a third party. *W. Texas Transmission* at 1564. "In most of those cases, however, the contract which created the preemptive right specified that price would be the only relevant term." *Id.*, citing *Kroehnke v. Zimmerman*, 171 Colo. 365, 467 P.2d 265 (1970) ("If during the term of this lease . . . the lessors . . . should desire to sell said demised premises, then the lessees . . . shall have the privilege of purchasing the same for the same price for which the lessors would be willing to sell to any other person.");

*Schmidt v. Downs*, 775 P.2d 427, 430 (Utah App. 1989); *Wilson v. Whinery*, 37 Wash.App. 24, 678 P.2d 354 (1984).

{¶ 76} The right of first refusal at issue here, states in relevant part:

> The City shall have the right at any time following the completion of the Project to convey the Parcels and the Project to an unrelated third party, provided that the [CP] shall have a right of first refusal to acquire the Parcels and Project from the City at the same price offered by such third party.

This is a "price-only" provision because it does not expressly require acceptance of all the terms provided in the third-party buyer's offer. If the parties had intended acceptance of all the terms and conditions in the third-party buyer's offer, it could have written such a requirement into the agreement, but it did not. Therefore, CP could have exercised its right of first refusal solely by matching E&C's price.

{¶ 77} CP matched E&C's price, but its offer included additional terms and conditions that were not provided in either E&C's offer or in the right of refusal. When a holder of a right of first refusal purports to accept a sale price but modifies or adds other nonprice conditions, "the preemptive lapses because the rightholder has failed to make a valid acceptance." *W. Texas Transmission* at 1564. A rightholder's purported acceptance of the purchase price that "modifies, adds to or otherwise qualifies the terms of the offer, generally constitutes a rejection of the option and a counter-offer." *Id.*, citing *Austin Presbyterian Theological Seminary v. Moorman*, 391 S.W.2d 717 (Tex. May 19, 1965); *Hutcherson v. Cronin*, 426 S.W.2d 638 (Tex. 12th Dist. Mar. 28, 1968); *Lambert v. Taylor Tel. Co-Operative*, 276 S.W.2d 929 (Eastland Tex. Mar. 11, 1955); *Brownies Creek Collieries, Inc. v.*

*Asher Coal Mining Co.*, 417 S.W.2d 249, 252 (Ky. June 30, 1967); *N.W. Television Club v. Gross Seattle Inc.*, 96 Wash. 2d 973 (Wa. Oct. 1, 1981); *Matson v. Emory*, 36 Wash. App. 681 (Feb. 21, 1984).

{¶ 78} The rationale behind this strict rule is both practical and structural. The rule allows the seller to remain "master of the conditions under which he will relinquish his interest." *W. Texas Transmission* at 1563. Allowing selective matching on the part of a rightholder would undermine the seller's ability to obtain the full value of the bargain negotiated with the third party. *See Miller v. LeSea Broadcasting, Inc.*, 87 F.3d 224 (1996) (holding that without the requirement of exact matching, the right of first refusal "is an impediment to the marketability of property, because it gives the holder of the right a practical power to impede a sale to a third party by refusing to match the third party's offer exactly and then arguing that the discrepancy was immaterial").

{¶ 79} In exercising its right of first refusal, CP sent a letter to Westlake, dated November 20, 2024, offering to purchase the Market Square property for $2,600,000, the same price offered by E&C. However, the right of first refusal included the conditions that (1) the property would be exempt from property tax, and (2) "the Purchase Price will be eligible for reimbursement from the Crocker Park Phase 3 waterfall." (Verified amended complaint, Exhibit Q.) These additional terms and conditions constituted (1) a rejection of the offer that was based on the third-party buyer's price and (2) a counteroffer to purchase the property with additional terms. Because CP never accepted the offer to purchase the property for

$2,600,000, reasonable minds can only conclude that CP failed to properly exercise its right of first refusal within a reasonable time.  Therefore, the trial court erred as a matter of law when it declared that CP did not waive its right of first refusal.

{¶ 80} Accordingly, the fifth assignment of error is sustained.

{¶ 81} The trial court's judgment is affirmed in part and reversed in part.  The case is remanded to the trial court for further proceedings.

It is ordered that appellees and appellant share costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN T. GALLAGHER, PRESIDING JUDGE

EMANUELLA D. GROVES, J., and
MARY J. BOYLE, J., CONCUR